# In the United States Court of Federal Claims

## BID PROTEST
No. 12-75C
(Filed Under Seal:  August 17, 2012)
(Reissued for Publication:  August 29, 2012)[*]
TO BE PUBLISHED

|  |  |  |
|---|---|---|
| CROMAN CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | Forest Service solicitation to acquire |
| | ) | helicopters for use in fighting forest fires; |
| Defendant, | ) | protests by plaintiff and other offerors at |
| | ) | GAO; Forest Service proposes corrective |
| and | ) | action; plaintiff's bid protest action seeks |
| | ) | to challenge corrective action; ripeness; |
| MOUNTAIN WEST HELICOPTERS, | ) | standing; mootness; evaluation of |
| LLC, | ) | proposals; FAR 15.305(a); rating methods |
| | ) | neither irrational nor contrary to law; |
| and | ) | plaintiff fails to show prejudice due to |
| | ) | alleged errors in best-value tradeoff |
| COLUMBIA HELICOPTERS, INC., | ) | determinations. |
| | ) | |
| and | ) | |
| | ) | |
| SILLER HELICOPTERS, INC., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| | ) | |

Alan I. Saltman, Stephen J. Kelleher, Smith, Currie & Hancock LLP, Washington, D.C., for plaintiff.

---

[*] This Opinion and Order was originally filed under seal on August 17, 2012 (docket entry 69) pursuant to the protective order entered on March 2, 2012 (docket entry 18).  The parties were given an opportunity to advise the Court of their views with respect to what information, if any, should be redacted under the terms of the protective order.  The parties filed a Joint Status Report with proposed redactions on August 23, 2012 (docket entry 71).  The Court has reviewed the parties' proposed redactions and concluded that they should be accepted.  Accordingly, the Court is reissuing its Opinion and Order dated August 17, 2012, with redactions indicated by three consecutive asterisks within brackets ([***]).

Russell J. Upton, Trial Attorney, Scott D. Austin, Assistant Director, Jeanne E. Davidson, Director, Commercial Litigation Branch, Stuart F. Delery, Acting Assistant Attorney General, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  Elin M. Dugan, Senior Counsel, Office of the General Counsel, United States Department of Agriculture, Washington, D.C., of counsel.

Barry N. Johnson, Bennett Tueller Johnson & Deere, Salt Lake City, Utah, for defendant-intervenor Mountain West Helicopters, LLC.

Robert K. Stewart, Jr., Davis Wright Tremaine LLP, Anchorage, Alaska, for defendant-intervenor Columbia Helicopters, Inc.

V. Blair Shahbazian, Murphy Austin Adams Schoenfeld LLP, Sacramento, Cal., for defendant-intervenor Siller Helicopters, Inc.

## OPINION AND ORDER

GEORGE W. MILLER, Judge

Plaintiff Croman Corporation ("Croman") filed a complaint against the United States alleging that the U.S. Forest Service's ("Forest Service") evaluations of proposals in response to a solicitation for helicopters for its exclusive use in fighting forest fires and its best-value tradeoff determinations were irrational and contrary to law.  For the reasons set forth below, the Court **DENIES** plaintiff's motion for judgment on the administrative record; **DENIES** defendant's motion to dismiss on grounds of mootness and lack of standing; **DENIES** defendant's motion to strike attachment 1 to plaintiff's response brief and related portions of plaintiff's response brief; and **GRANTS** defendant's and defendant-intervenor Siller Helicopters, Inc.'s ("Siller") cross-motions for judgment on the administrative record.[1]

---

[1] _See_ Pl.'s Mot. for J. on Administrative R. ("Pl.'s Mot.") (docket entry 33, Apr. 27, 2012); Pl.'s Supplemental Br. to Pl.'s Mot. on Administrative R. in Wake of Agency's Resolicitation of Cancelled Line Items 21, 22, 27, & 34 ("Pl.'s Supplemental Br.") (docket entry 38, May 18, 2012); Def.-Intervenor Siller's Opp'n to Croman's Mot. for J. on Administrative R. & Cross-Mot. for J. on Administrative R. ("Def.-Intervenor Siller's Mot. & Opp'n") (docket entry 41, June 6, 2012); Def.'s Mot. to Dismiss for Lack of Subject Matter Jurisdiction, Opp'n to Pl.'s Mot. for J. upon Administrative R., & Cross-Mot. for J. upon Administrative R. ("Def.'s Mots. & Opp'n") (docket entry 43, June 6, 2012); Def.'s Reply to Pl.'s Resp. to Def.'s Mot. to Dismiss for Lack of Subject Matter Jurisdiction & Cross-Mot. for J. upon Administrative R. & Def.'s Mot. to Strike ("Def.'s Reply & Mot.") (docket entry 60, July 3, 2012).

# I.     Background

### A.     Solicitation

In February 2011, the Forest Service issued an amended solicitation, RFP AG-024B-S-11-9001 ("RFP 11-9001"), for helicopters for its exclusive use in fighting forest fires.  *See* AR Tab 7, at 46, 120.  The Forest Service sought contracts at a fixed price with an economic price adjustment not to exceed one base year and three one-year option periods.  AR Tab 7, at 46.  The Forest Service indicated "[t]he performance requirements are a minimum and the helicopter[s] will be evaluated for overall best value considering price and other factors."  *Id.*  The Forest Service stated that it "may award a single contract or multiple awards based on the outcome of the evaluation process" and that it "reserves the right to award any combination of items and/or number of items."  *Id.*

The solicitation called for 34 helicopters to be operated from host bases during mandatory availability periods.  AR Tab 7, at 47–114.  Contract line item numbers ("CLIN") 1 to 15 required helicopters with heavy-lift capabilities—helicopters that had the "capability of hovering out of ground effect (HOGE) at 8,000 feet pressure altitude and 25 °Celsius with . . . jettisonable payload of 5000 pounds."[2]  AR Tab 7, at 117 (original capitalization and bold omitted).  In other words, for CLINs 1 to 15, the Forest Service sought helicopters that could carry at least 5,000 pounds of water or retardant at 8,000 feet pressure altitude and 25 degrees Celsius.  CLINs 16 to 34 required helicopters with medium-lift capabilities—helicopters that had the "capability of . . . [HOGE] at 7,000 feet pressure altitude and 20 °Celsius with . . . jettisonable payload of 3300 pounds."  *Id.* (original capitalization and bold omitted).  By definition, a helicopter that had heavy-lift capabilities had medium-lift capabilities, but not vice versa.  The solicitation explained how the jettisonable payload would be determined.  *See* AR Tab 7, at 117, 211–12, 249.

The offerors were permitted to propose multiple helicopters for each CLIN and permitted to propose the same aircraft for multiple CLINs.  However, only one aircraft would be selected for each CLIN, and the same aircraft could not be selected for multiple CLINs.

The solicitation indicated that the government would award contracts to the responsible offerors on the basis of price and five technical factors.  The technical factors were (1) mandatory documentation, (2) aircraft performance, (3) safety/risk management ("safety/risk"), (4) past performance, and (5) organizational experience.  AR Tab 7, at 280.  The non-price factors, when combined, were "significantly more important" than price.  *Id.*  The mandatory documentation factor was evaluated on a pass/fail basis.  *Id.*  If the proposal received a pass for the mandatory documentation factor, the government would next determine whether the aircraft performance was "acceptable (pass) or unacceptable (fail)."  *Id.*  Proposals that passed would

---

[2] The solicitation defined "HOGE" as the "[m]aximum pressure altitude and temperature [at] which a helicopter can hover (at maximum gross weight) without the effects of ground cushion per the Flight Manual/Supplements and [Supplemental Type Certificate] performance charts." AR Tab 7, at 175.  HOGE is not an issue in this protest.

"next receive qualitative evaluations for Aircraft Performance and for each of the remaining three technical evaluation factors." *Id.*

To determine the total price, the government would add (1) the price for the base year, (2) the prices for the option periods, and (3) the flight rate multiplied by the estimated flight hours. *Id.* The price proposals would be evaluated "to determine reasonableness and to determine the demonstrated understanding of the level of effort needed to successfully perform the services." *Id.* The price proposals would also be evaluated using a "Best Value" formula set forth in the solicitation. *Id.* "The 'Best Value' formula computes the amount it would cost to transport a pound of product for the specific helicopter being offered" and would "be used to make trade-off determinations to measure aircraft efficiencies of make and models of helicopters offered." AR Tab 7, at 275. Because offerors would be permitted to propose the same aircraft for multiple CLINs, an aircraft's total price and price per pound could differ depending on the CLIN for which it was being offered. Similarly, because offerors would be permitted to propose multiple helicopters for the same CLIN, a price proposal's total price and price per pound for a CLIN could differ based on the specific aircraft.

The technical factors were listed in the solicitation in order from most important to least important: mandatory documentation, aircraft performance, safety/risk, past performance, and organizational experience. AR Tab 7, at 280. If a technical factor had subfactors, the subfactors were equal in importance. *Id.* The mandatory documentation factor listed twelve categories of required documents. For the aircraft performance factor, the offerors were informed that a proposed aircraft would be evaluated based on "Helicopter Load Calculation." AR Tab 7, at 281. In short, the aircraft performance factor was concerned with how many pounds of water or retardant an aircraft could carry. For the safety/risk factor, the offerors were informed that their proposals would be evaluated based on (i) accident history (last 5 years)—(1) annual average flight hours, (2) number of aircraft accidents and number of incidents, and (3) insurance carrier verification letter—and (ii) safety management systems—(1) policy, (2) safety assurance, (3) safety promotion, and (4) risk management. *Id.* The past performance factor would be evaluated based on the following subfactors: (i) "capable, efficient, and effective"; (ii) "performance conforms to the terms and conditions of [past] contracts"; (iii) "reasonable and cooperative during [past] performance"; and (iv) "committed to customer satisfaction." *Id.* The organizational experience factor would be evaluated for (i) "[m]anagement [p]ersonnel commensurate with size and complexity of operation, (ii) "[p]ilot(s) in [c]ommand," and (iii) "[m]aintenance [p]ersonnel." AR Tab 7, at 281–82.

Offerors were informed that the awards would "be made to those offerors whose proposals are technically acceptable and whose technical/price relationships are the most advantageous to the Government." AR Tab 7, at 282. The solicitation provided that "the critical factor in making any price/technical trade-off is not the spread between the technical scores, but, rather, the significance of that difference." *Id.* The solicitation further provided:

> The significance of the spread of scores will be determined on the basis of what the difference might mean in terms of performance and what it would cost the Government to take advantage of it. Award may not necessarily be made for technical capabilities that would appear to exceed those needed for successful

performance of the work.  The Government reserves the right to make price/technical trade-offs that are in the best interest and advantageous to the Government.  The Government may reject any or all offers if such action is determined to be in the best interest of the Government.

*Id.*

### B.      Source Selection Plan

The Source Selection Plan ("SSP") provided that the Technical Evaluation Team ("TET") was to "assign to each evaluation criterion a final adjective consensus."  AR Tab 3, at 24.  The SSP defined the adjectival ratings of exceptional, acceptable, neutral, marginal, and unacceptable.  *See* AR Tab 3, at 24–25.

### C.      Plaintiff's Proposal

Eighteen small businesses, including plaintiff, submitted proposals in response to the solicitation, proposing a total of 58 helicopters for the 34 CLINs.  AR Tab 29, at 13393; *see also* AR Tab 13 (plaintiff's proposal).  In its proposal submitted in March 2011, plaintiff offered 3 of its helicopters (N611CK, N612CK, and N613CK) on all 34 CLINs and 2 helicopters (N1043T and N1048Y) on CLINs 16 to 34.  *See* Pl.'s Mot. for J. on Administrative R. ("Pl.'s Mot.") 3–4 (docket entry 33, Apr. 27, 2012).  In May 2011, the agency informed plaintiff that helicopters N611CK, N612CK, and N613CK would not be evaluated for CLINs 1 to 15 because they did not meet the minimum payload requirement.  *Id.* at 4.  Plaintiff withdrew helicopter N1048Y from consideration because it became committed to other work.  *Id.*  Thus, this protest pertains to plaintiff's helicopters N611CK, N612CK, N613CK, and N1043T proposed for CLINs 16 to 34.  *Id.*

### D.      Technical and Price Evaluations, Cancellation of 4 CLINs, Best-Value Tradeoff Determinations, and 30 Awards

In March 2011, "the TET addressed issues with the proposals, identified proposal clarifications, and documented concerns leading to discussions with the Offerors."  AR Tab 29, at 13393.  In May 2011, "discussions were conducted with all Offerors and after reevaluation of the proposals and after further clarifications, technical negotiations were concluded" in June 2011.  *Id.*; *see also* AR Tab 28.

All proposals passed the mandatory documentation factor.  *See* AR Tab 29, at 13407.  For the aircraft performance factor, the proposals received a different numerical rating for each proposed aircraft with respect to each CLIN for which the aircraft was proposed.  *See* AR Tab 29, at 13395, 13405, 13407, 13414–15.  A computer Optimization Model ("OM"), AR Tab 29, at 13413, calculated a numerical rating of 1 to 5 (1 being the best) carried out to multiple decimals (e.g., 4.5745) for the aircraft performance factor.  The numerical rating was based on *both* the number of pounds by which the aircraft exceeded the minimum payload requirement of the CLIN for which the aircraft was being evaluated *and* the number of pounds by which the *other helicopters* proposed for the same CLIN by other offerors exceeded the minimum payload requirement.  Because the rating was based in part on the other helicopters proposed by other

offerors, the numerical rating allowed the agency to compare the proposed helicopters.  The calculation of the numerical rating was based on a formula created by the TET.  *See* AR Tab 29, at 13414–15.

It is not necessary to list plaintiff's numerical ratings for each aircraft for each CLIN that is relevant to this protest.  The fact that is relevant is plaintiff (along with other offerors) proposed helicopters that only exceeded the minimum payload requirement of 3,300 pounds for CLINs 16 to 34 by hundreds of pounds, whereas some other offerors proposed helicopters that exceeded the minimum payload requirement by thousands of pounds.  *See generally* AR Tab 29, at 13423–34 (rows 260–906, column S).  As will become evident below in the discussion of the best-value tradeoff determinations, an offeror proposing an aircraft that did not exceed a minimum payload requirement by many pounds could still be awarded the CLIN, although it was more difficult because the aircraft performance factor was the most important technical factor that was qualitatively evaluated.

For the safety/risk factor, the TET assigned proposals an adjectival rating of exceptional, acceptable, marginal, or unacceptable.  *See* AR Tab 29, at 13395, 13397, 13405–07, 13413–15.  In this procurement, numerical ratings were used to "represent[] the unique differences within the adjectival rating."  AR Tab 29, at 13397.  To arrive at the adjectival and numerical ratings for this factor, the TET's lead safety officer assigned an adjectival rating and corresponding whole number of exceptional-1, acceptable-2, marginal-4, and unacceptable-5 to the subfactors and then averaged the ratings for the subfactors.  The averaging of subfactor whole number numerical ratings meant that a proposal could receive a numerical rating for the factor carried out to multiple decimals.

Plaintiff's proposal, along with every other proposal, received an exceptional rating for the safety/risk factor.  AR Tab 29, at 13396.  All sixteen of the proposals either received a 1.0 or 1.8 numerical rating.  Plaintiff's proposal, as well as six other proposals, received a 1.8.  *See* AR Tab 29, at 13397.

The past performance factor was evaluated using the same adjectival and numerical rating method that was used for the safety/risk factor, although the adjectival neutral and numerical 3 ratings were also used for this factor.  *See* AR Tab 29, at 13395, 13397, 13405–07, 13413–16.  Proposals were assigned numerical ratings carried out to multiple decimals (e.g., 1.4375).  The TET arrived at its adjectival and numerical ratings for this factor by using the evaluations of four expert groups (maintenance, operations, pilots, and safety).  Each expert group conducted its own evaluation.  The group assigned an adjectival rating and corresponding whole number of 1 to 5 to each of the subfactors and then averaged the subfactor ratings to arrive at adjectival and numerical ratings for the factor.  Once each expert group had assigned adjectival and numerical ratings to the past performance factor, the four expert groups' adjectival and numerical ratings were averaged to arrive at the TET's adjectival and numerical ratings for the past performance factor.

Plaintiff's proposal received exceptional and 1.4375 ratings for the past performance factor.  Three of the other fifteen proposals received numerical ratings better than plaintiff's for the past performance factor.  AR Tab 29, at 13396–97.

The last technical factor, organizational experience, was evaluated using the same adjectival and numerical rating method that was used for the safety/risk factor. Like the past performance factor, the TET relied on the evaluations of four expert groups. *See* AR Tab 29, at 13395, 13397, 13405–07, 13413–16. Like the past performance factor, proposals were assigned numerical ratings carried out to multiple decimals. Plaintiff received exceptional and 1.75 ratings. Five of the other fifteen proposals received better numerical ratings. *See* AR Tab 29, at 13397.

After requesting and analyzing proposed price revisions in August 2011, the agency concluded that "a number of the aircraft proposed were higher than anticipated," AR Tab 29, at 13393, and thus requested a second round of price revisions. The analyses of those were completed in September 2011. Plaintiff did not revise its price proposal in response to either request. Pl.'s Mot. 5; *see* AR Tab 13, at 5156, 5160.

Following a briefing by the TET on price in October 2011, the Forest Service management recommended that the TET "[r]eview the pricing for aircraft that were priced higher than other similarly performing aircraft." AR Tab 29, at 13393. As a result of this recommendation, the TET eliminated two helicopters of the same model proposed by [***] "due to higher pricing compared to other similar performing aircraft and cost more than the Agency was willing to pay." *Id.* The management also recommended, due to budget concerns and based on previous analysis, that "an optimum number of aircraft was determined to be thirty (30)," *id.*, causing the TET to eliminate 4 CLINs from CLINs 16 to 34, which were chosen based on "staffing and location requirements." *Id.*; *see also* AR Tab 29, at 13405, 13408–09, 13413.

Plaintiff's lowest total price for the CLINs related to this protest—CLINs 17, 23, 28, 29, 30, 32, and 33—was approximately [***]. *See, e.g.*, AR Tab 29, at 13430 (row 647, column N). Plaintiff's lowest price per pound for an aircraft proposed for CLINs 17, 23, 28, 29, 30, 32, and 33 was [***]. *See, e.g.*, *id.* (row 650, column O).

The TET Evaluation stated, "The proposed prices were evaluated after the technical proposal evaluations were completed to determine price reasonableness and each offerors [sic] level of understanding of effort needed to successfully perform the contract services." AR Tab 29, at 13407. "The price evaluations included total overall price reasonableness, the best value formula and cost per pound delivered for each helicopter . . . ." *Id.*; *see also* AR Tab 29, at 13397–98.

The TET then used the Optimization Model to assist it in recommending an aircraft for each CLIN that represented the best value. AR Tab 29, at 13394–98, 13407, 13409, 13413–18. The OM "is a goal programming solver," which means that it "simultaneously minimize[s] weighted deviations from pre-specified goals." AR Tab 67, at 16042. "It accomplishes this by solving the optimization problem, exploring all possible assignment sets, and searching for the assignment set where improvements can no longer be made (e.g., until total deviations can't be reduced anymore)." *Id.* A detailed description of the OM's calculations can be found in Administrative Record Tab 29, at 13413 to 13418, and Administrative Record Tab 67, at 16040 to 16045. *See also* Def.'s Mot. to Dismiss for Lack of Subject Matter Jurisdiction, Opp'n to Pl.'s Mot. for J. upon Administrative R., & Cross-Mot. for J. upon Administrative R. ("Def.'s Mots. &

Opp'n") 14 ("The Forest Service developed the OM in order to more efficiently review and evaluate what previously had required the TET to manually review more than 250 spreadsheets (more than 1000 pages in all) and required an enormous amount of time and resources.") (docket entry 43, June 6, 2012).

In selecting the proposal that represented the best value for a CLIN, the OM considered the "overall technical rating," total price, and price per pound. The overall technical rating was the average of the numerical ratings for the aircraft performance, safety/risk, past performance, and organizational experience factors at the following weights selected by the TET: [***] percent for the aircraft performance factor, [***] percent for the safety/risk factor, [***] percent for the past performance factor, and [***] percent for the organizational experience factor (which reflected the descending level of importance of these factors per the solicitation).[3] The OM "priorit[zed]" or "emphas[ized]," AR Tab 29, at 13414, the overall technical rating, total price, and price per pound at the following weights set by the TET: [***] percent for the overall technical rating, [***] percent for the total price, and [***] percent for the price per pound (which reflected that the non-price factors, when combined, were significantly more important than price per the solicitation).

The TET evaluated the OM's results before making its recommendations to the contracting officer ("CO"). The TET Evaluation stated, "The TET evaluated the aircraft placement at the different bases by using professional judgement, historical knowledge of needs and offerors [sic] capability and verified that [the selections] represented overall best value." AR Tab 29, at 13409. After reviewing all the data, the TET chair "consider[ed] the outputs and determine[d] if the[y] [were] the correct Locations, Type, Model, appropriate costs that the agency is willing to accept and other factors not represented in the OM." Id.

The TET Evaluation further stated that "[i]t is important to understand that the OM is a tool that assists with technical and cost outputs but there must be a human influence for the overall evaluation and recommendations to be complete." Id. The TET did not follow the OM selections in two ways. First, the TET exchanged the helicopters selected for CLINs 6 and 15 because the OM had placed an aircraft "that was at a higher cost with less capability into a longer [mandatory availability period CLIN]." Id. Second, an offeror with a total fleet of four that would have been awarded four CLINs was only recommended for award of three CLINs "in order to position the offeror for better support to the agency and enable them to be successful if there were unforeseen problems." Id.

During the evaluation process, in addition to the two helicopters proposed by Erickson that were eliminated from consideration based on price, nine helicopters were withdrawn by four offerors. AR Tab 29, at 13398, 13408. When withdrawing their helicopters, two offerors withdrew their entire proposals. Ultimately, 47 helicopters from 16 small businesses were available for awards of 30 CLINs.

---

[3] Plaintiff's overall technical ratings for the helicopters proposed for CLINs 16 to 34 ranged from [***] to [***]. AR Tab 29, at 13397.

The TET recommended awards to 11 of the 16 remaining offerors.  AR Tab 29, at 13399.  Plaintiff was not recommended for an award.  *Id.*  Defendant-intervenor Siller was recommended for award of 3 CLINs, including CLIN 23, which is relevant to this protest.  Non-party Firehawk Helicopters, Inc. ("Firehawk") was recommended for award of CLINs 17, 28, and 33, all of which are subject to this protest.  Defendant-intervenor Columbia Helicopters, Inc. ("Columbia") was recommended for award of 4 CLINs, including CLINs 29 and 30, which also are subject to this protest.  Non-party HeliQwest International ("HeliQwest") was recommended for 2 CLINs, one of which, CLIN 32, pertains to this protest.[4]

The CO requested and received source selection authority.  AR Tab 29, at 13392–402.  Successful and unsuccessful offerors were notified by letter in December 2011.  *See* AR Tabs 34–35.  Plaintiff requested and received a debriefing.  *See* AR Tab 38.

E.       *Protests at the Government Accountability Office*

Plaintiff and two other unsuccessful offerors filed protests at the Government Accountability Office ("GAO") in December 2011 and January 2012.  *See* AR Tabs 42–43, 49.  Plaintiff claimed that (1) plaintiff's technical proposal was not properly evaluated and, as a result, the agency failed to perceive that plaintiff's proposal was "significantly superior" to the awardees' proposals for CLINs 16 to 34 (except the cancelled CLINs) and should have been awarded 4 of those CLINs; (2) any significance in the technical advantage perceived by the agency for CLINs 17, 23, 28, 29, 30, 31 and 33 was insignificant because of the cost to take advantage of it; (3) the award of CLIN 23 to defendant-intervenor Siller was improper because "it was beyond the scope of competition reasonably contemplated based on the wording of the solicitation and, resulted in the Forest Service's acquisition of technical capabilities that greatly exceeded those needed for the successful performance of the work . . . (and at an increased cost of some [***])"; (4) the agency improperly cancelled part of the solicitation; and (5) the agency failed to request a new round of best and final offers upon cancelling part of the solicitation.  AR Tab 43, at 14527–28.

The agency filed a motion to dismiss all three protests in January 2012, *see* AR Tab 50, to which the three protestors responded.  *See* AR Tabs 51–53.  GAO submitted requests for clarifications to plaintiff, another protestor, and the agency, to which each responded.  *See* AR Tabs 54–58.  In January 2012, GAO dismissed plaintiff's protest after deciding that plaintiff's first claim was an untimely challenge to the terms of the solicitation and plaintiff's other claims lacked merit.  *See* AR Tab 59.  GAO dismissed the other protests as academic in early February 2012 after the agency proposed corrective action in late January 2012 in response to those protests.  *See* AR Tabs 60–61.  The agency's proposed corrective action did not address the issues raised in plaintiff's protest.

---

[4] As discussed below, the agency later implemented corrective action in response to protests at the Government Accountability Office.  *See infra* Part I.E–F.  Defendant-intervenor Columbia was awarded CLIN 32 as a result of the corrective action.

F.    *Corrective Action*

        The Forest Service agreed to reevaluate three of the five technical factors of
all proposals: safety/risk, past performance, and organizational experience.  AR Tab 67, at
15992; *see also* AR Tab 67, at 16006.  The mandatory documentation and aircraft performance
factors were not reevaluated because, according to the Forest Service, "both were initially
sufficiently evaluated."  AR Tab 67, at 15992; *see also* AR Tab 67, at 16012.  Because the
awards for CLINs 1 to 15 had not been protested, the reevaluations pertained only to CLINs 16
to 34.  AR Tab 67, at 15992.

        "The TET Chair reconvened a group . . . . [and the safety/risk, past performance, and
organizational experience factors] were reevaluated from each Offeror's proposal, and the initial
ratings were either confirmed or revised as determined by the outcome of the reevaluations."  AR
Tab 67, at 16012.  The evaluation of the safety/risk factor was "refined to allow the TET to
account for each vendor's number of accidents and to reflect the differences between Offerors."
AR Tab 67, at 16014; *see also* AR Tab 67, at 15996.  The TET's lead safety officer reevaluated
the proposals and the TET chair "concur[red] with the ratings assigned to each vendor."  AR Tab
67, at 16018.  Plaintiff's proposal was assigned an adjectival rating of exceptional, and its
numerical rating was [***], an improvement from its initial [***] numerical rating.  AR Tab 67,
at 15997–98, 16011–16.  The TET Reevaluation "narrative" attached to the Revised Request for
Source Selection Authority noted that plaintiff had one accident with a five year average of
20,000 flight hours per year and that plaintiff had a safety management system program.  AR
Tab 67, at 16019.

        The past performance factor was also reevaluated.[5]  "The CO and the TET Chair found
issues on four of the individual rating forms, which were revised and re-rated . . . ."  AR Tab 67,
at 16022.  Plaintiff received the same adjectival and numerical ratings that it received on the
initial evaluation: [***] and [***].  AR Tab 67, at 15997–98, 16011, 16024–25.  The TET
Reevaluation narrative stated that plaintiff "[h]as been acceptable for past contracts" for
subfactor "[c]apable, [e]fficient and [e]ffective"; "[h]as been acceptable for conformance on past
contracts" for subfactor "[p]erformance conformed to terms and conditions of contracts"; "[h]as
been very reasonable and cooperative on past contracts" for subfactor "[r]easonable and
cooperative during performance"; and "[h]as been exceptionally committed to customer
satisfaction on past contracts" for subfactor "[c]ommitted to customer satisfaction."  AR Tab 67,
at 16024–25.

---

[5] Defendant states that the expert-group approach used in the initial evaluation of the past
performance and organizational experience factors was not used on reevaluation.  *See* Def.'s
Mots. & Opp'n 10 n.6; Def.'s Reply & Mot. 28–29.  Even if the expert-group approach was not
used in the reevaluation, as plaintiff points out, the reevaluation resulted in the same numerical
rating, "down to the fourth decimal," Pl.'s Resp. to Def.'s Mot. to Dismiss for Lack of Subject
Matter Jurisdiction, Opp'n to Pl.'s Mot. for J. upon Administrative R., & Cross-Mot. for J. upon
Administrative R. ("Pl.'s Resp.") 37 (docket entry 54, June 20, 2012), in *most* of the numerical
ratings.  *See also id.* at 37 n.36 (explaining the few instances in which the past performance
numerical ratings changed based on the reevaluation).

The organizational experience factor was also reevaluated.  "The Technical Chair and Contracting Officer reviewed the initial Technical Evaluation forms used by the Technical Evaluation Team.  The CO and Chair found no issues and therefore no changes were made to this factor."  AR Tab 67, at 16029.  Plaintiff received [***] and [***] ratings.  AR Tab 67, at 15997–98.  For the subfactors, the TET Reevaluation narrative stated that plaintiff proposed acceptable management personnel, acceptable pilots in command, and above acceptable "A & P's."[6]  AR Tab 67, at 16031.

Following the reevaluation of three of the technical factors, the numerical ratings were re-run through the OM with respect to CLINs 16 to 34, resulting in six changes.  "For four of the line items, the recommended vendor stayed the same, but the OM recommended a different aircraft.  For line items 31 and 32, the OM swapped aircraft, putting HeliQwest aircraft in the spot previously awarded to Columbia and vice versa."  AR Tab 67, at 16012; *see also* AR Tab 67, at 16006, 16008.   In a document explaining the OM that was attached to the Revised Request for Source Selection Authority, the agency stated:

> Note that the OM performs these calculations and assignments simultaneously.  Therefore, documentation of the tradeoff performed for each separate line item (for example, "what tradeoff was made in order to justify the award of CLIN 16 to X instead of Y?") is not possible.

> The best we can do to demonstrate the tradeoffs at individual line items that were considered by the OM is to compare the set of assignments from the weighted OM solution to single objective solutions: the lowest adjectival score, the lowest total cost and the lowest price per pound.  Attachment 7 provides a comparison between the weighted OM solution for line items 16-34 and the OM assignments when 100 percent of the weight is applied to each of the three single objectives.

AR Tab 67, at 16044; *see also* AR Tab 67, at 16210.

The TET Reevaluation stated, "After fully evaluating the outputs and confirming appropriateness, we have concluded that the recommendations should be awarded, as modeled, without necessitating any human element changes.  The OM has in effect identified the optimum configuration of helicopters, the best make/model and provided the most reasonable price for the agency . . . ."  AR Tab 67, at 16034–35.

The Source Selection Authority ("SSA") agreed with the recommendations made by the CO.  In the Source Selection Certification, the SSA stated:

> Each of the 15 awards reflects the best overall value to the Government, considering that our intent was to emphasize technical superiority (especially payload capacity) over low price.  The importance of technical superiority is

---

[6] "A & P's" appears to refer to a Federal Aviation Administration certificate for maintenance personnel—"Airframe & Powerplant."  *See* AR Tab 13, at 4665.

shown in the assignment of a weight of [***] percent to those factors, as
compared with the [***] percent assigned to price factors.  The Optimization
Model used those weights to perform tradeoffs reflecting the greater importance
of technical ratings.  I have reviewed the model's results and confirm that they
represent best value and prioritized aircraft performance over price, while still
taking price into account.

AR Tab 68, at 16213.

In March 2012, the agency sent letters to successful and unsuccessful offerors regarding
the result of the corrective action.  *See* AR Tabs 69–70.  Plaintiff did not receive an award.
Plaintiff requested and received a debriefing.  *See* AR Tab 72.

G.      *Recent Solicitation for Four Helicopters*

In May 2012, over three months after this bid protest was filed, the agency issued a
solicitation, RFP AG-024B-S-12-9025 ("RFP 12-9025").  *See* Pl.'s Mot. to Supplement
Administrative R. attach. (docket entry 37, May 18, 2012).  Plaintiff asserts that the latest
solicitation seeks "the exact same services and equipment that were the subject of the partial
cancellation of RFP-9001."  Pl.'s Supplemental Br. to Pl.'s Mot. in Wake of Agency's
Resolicitation of Cancelled Line Items 21, 22, 27, & 34 ("Pl.'s Supplemental Br.") 2 (docket
entry 38, May 18, 2012).  However, defendant notes that the solicitations were issued "one year
apart and for performance at different locations, during different time periods."  Def.'s Opp'n to
Pl.'s Mot. to Supplement Administrative R. 10 (docket entry 40, June 4, 2012).  Plaintiff
submitted a proposal in response to the latest solicitation, but it received notice in June 2012 that
it did not receive an award.  *See* Pl.'s Resp. to Def.'s Mot. to Dismiss for Lack of Subject Matter
Jurisdiction, Opp'n to Pl.'s Mot. for J. upon Administrative R., & Cross-Mot. for J. upon
Administrative R. ("Pl.'s Resp.") attach. 1 (docket entry 54, June 20, 2012).

H.      *Instant Action*

Plaintiff filed this bid protest in early February 2012, a few days after the corrective
action was proposed and approximately one month before the corrective action was completed.
*See* Compl. (docket entry 1, Feb. 3, 2012).  Plaintiff's complaint alleged claims similar to the
claims it alleged before GAO, although it also alleged that the Forest Service's proposed
corrective action would not cure the alleged errors.

The Court granted defendant-intervenors Mountain West Helicopters, LLC's ("Mountain
West"), Columbia's, and Siller's motions to intervene (docket entry 16, Mar. 2, 2012; docket
entry 21, Mar. 22, 2012).[7]  The Court held status conferences on February 6 and 13, 2012; on
March 2, 16, and 22, 2012; and on May 16, 2012.

---

[7] As plaintiff did not protest CLINs awarded to defendant-intervenor Mountain West, defendant-
intervenor Mountain West did not participate in the briefing on the merits.  Its counsel was
present by phone at the July 16, 2012 oral argument, but did not participate.  Defendant-
intervenor Columbia filed an "Opposition to Plaintiff's Motion for Judgment on the
Administrative Record" (docket entry 44, June 6, 2012) and a "Reply to Plaintiff's Motion for

Plaintiff filed its motion for judgment on the administrative record in late April 2012, which was after the agency completed its corrective action in March 2012 and plaintiff was again not awarded any CLINs.  Plaintiff did not file a new bid protest or supplemental pleadings after the corrective action was completed.

In plaintiff's motion for judgment on the administrative record, supplemental brief in support of its motion, and response brief, plaintiff appears to have modified its claims from what it alleged at GAO and in its complaint before the Court in light of the fact that the corrective action had been completed and the administrative record had been filed.  In sum, plaintiff now claims (1) the rating methods used to evaluate the aircraft performance, safety/risk, past performance, and organizational experience factors were irrational or contrary to law; (2) the agency failed to sufficiently document strengths and weaknesses of the proposals; (3) the agency improperly failed to eliminate defendant-intervenor Siller's proposal in response to CLIN 23 based on price; (4) the agency's best-value tradeoff determinations were irrational or contrary to law; and (5) the agency's decision to partially cancel the solicitation was irrational and based on pretext.  Plaintiff's claims pertain solely to CLINs 17, 23, 28, 29, 30, 32, and 33—which were awarded to defendant-intervenor Siller, defendant-intervenor Columbia, and non-party Firehawk after the corrective action—and to CLINs 21, 22, 27, and 34, which were cancelled.  Notably, plaintiff alleges that many of the errors allegedly committed by the agency in the initial evaluations and initial best-value tradeoff determinations were repeated during the corrective action.  Plaintiff contended in its complaint that this would happen when the agency proposed the corrective action.

Defendant filed a motion to dismiss for lack of jurisdiction arguing that plaintiff's bid protest is moot and that plaintiff lacks standing to assert its claims.  Defendant also filed a cross-motion for judgment on the administrative record.  Defendant-intervenor Siller filed a cross-motion for judgment on the administrative record.  The Court heard oral argument on the parties' motions on July 16, 2012.

## II.      Discussion

### A.      *Plaintiff's Protest of the Agency's Corrective Action Is Within the Court's Bid Protest Jurisdiction and Is Ripe for Review*

Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, this court has exercised jurisdiction to hear bid protests in three circumstances:

---

Judgment on the Administrative Record" (docket entry 57, July 3, 2012).  Defendant-intervenor Siller filed an "Opposition to Croman Corporation's Motion for Judgment on the Administrative Record and Cross-Motion for Judgment on the Administrative Record" and a "Reply in Opposition to Croman Corporation's Motion for Judgment on the Administrative Record and in Support of Its Cross-Motion for Judgment on the Administrative Record" (docket entry 58, July 3, 2012).  Counsel for defendant-intervenors Columbia and Siller participated by phone in the July 16, 2012 oral argument.

(1) a pre-award protest, which is an objection to "a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award . . . of a contract"; (2) a post-award protest, which objects to "the award of a contract"; or (3) a protest objecting to "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."

*Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 527 (2010) (alteration in original) (citations omitted) (quoting 28 U.S.C. § 1491(b)(1)).  "The jurisdictional grant in 28 U.S.C. § 1491(b)(1) applies to the entire procurement process."  *Sys. Application & Techs., Inc. v. United States*, 100 Fed. Cl. 687, 705 (2011).  The Federal Circuit has broadly interpreted "procurement" to encompass the period from the agency's determination that it requires contracted goods or services through final contract award and completion.  *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008).

Here, defendant argues that plaintiff's protest is moot:

As Croman's complaint was filed over a month before the corrective action was completed, logically Croman could only have been challenging the December 16, 2011 award decisions.  But the corrective action by definition replaced the December 2011 award decisions.  The corrective action was an intervening event.  As such, Croman's complaint is challenging award decisions that no longer exist.

Although this Court possesses jurisdiction to review corrective action decisions, *see, e.g., The Centech Group, Inc. v. United States*, 78 Fed. Cl. 496, 506 (2007), Croman has yet to protest the corrective action.

Def.'s Mots. & Opp'n 23–24; *see also* Def.'s Reply to Pl.'s Resp. to Def.'s Mot. to Dismiss for Lack of Subject Matter Jurisdiction & Cross-Mot. for J. upon Administrative R. & Def.'s Mot. to Strike ("Def.'s Reply & Mot.") 3–7 (docket entry 60, July 3, 2012).

The mootness doctrine is one of several justiciability doctrines originating from the "case or controversy" requirement of Article III of the Constitution.[8]  "A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *NEC Corp. v. United States*, 151 F.3d 1361, 1369 (Fed. Cir. 1998) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)) (internal quotations marks omitted).  Under the Supreme Court's two-part test, a case is moot if "(1) it can be said with assurance that 'there is no reasonable expectation . . .' that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  *Cnty. of L.A. v.*

---

[8] The Court of Federal Claims is established under Article I of the Constitution, 28 U.S.C. § 171(a), and is not bound by the "case or controversy" requirement of Article III.  *Zevalkink v. Brown*, 102 F.3d 1236, 1243 (Fed. Cir. 1996).  This court has, however, applied the Article III justiciability doctrines for prudential reasons.  *See Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003).

*Davis*, 440 U.S. 625, 633 (1979) (alteration in original) (citations omitted) (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953)).

The Court agrees with defendant that the protest as it relates to the original awards is moot. *See Eskridge Research Corp. v. United States*, 92 Fed. Cl. 88, 93–94 (2010). However, the Court disagrees with defendant that the entirety of plaintiff's protest is moot. Plaintiff filed a complaint challenging more than just the initial evaluations and initial best-value tradeoff determinations. Plaintiff also challenged the agency's corrective action as being insufficient to cure the alleged errors committed by the agency in the initial evaluations and initial best-value tradeoff determinations.[9] *See* Compl. ¶¶ 6, 58, 65, 79–80, 97, 104. Plaintiff's objection to the corrective action, which was completed approximately one month after the protest was filed and approximately one month before briefing on the merits began, is not moot. Accordingly, the Court **DENIES** defendant's motion to dismiss for lack of jurisdiction on grounds of mootness.

Plaintiff's contention that the corrective action was inadequate to address the alleged errors falls within this court's bid protest jurisdiction and is ripe[10] for review despite the fact that plaintiff filed this bid protest approximately one month before the corrective action was completed. *Cf. McTech Corp. v. United States*, No. 12-122C, 2012 WL 2878157, at *6 (Fed. Cl. July 10, 2012) ("[T]he court has juridical power to entertain a complaint challenging proposed corrective action, and [the plaintiff] has stated a potentially viable challenge to the scope of the [agency's] corrective action in the amended complaint." (citations omitted)); *Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 179, 182 (2011) ("Although there is a possibility that [the plaintiff] may be awarded the contract as a result of the reprocurement, this fact does not make [the plaintiff]'s claim unripe. . . . [T]his is a pre-award bid protest in which [the plaintiff] is alleging flaws in the reprocurement process. The reprocurement process is virtually complete. There is no indication that the flaws [the plaintiff] complains of will be recognized and remedied by the agency."); *Eskridge Research Corp.*, 92 Fed. Cl. at 94–95 (holding that claims "regarding speculative and potential improprieties in the re-evaluation process" were not ripe, but noting

---

[9] The Forest Service's corrective action did not address plaintiff's objections at GAO because GAO dismissed plaintiff's first claim as untimely and the remaining claims on the merits. The corrective action only attempted to address the objections raised by the other two protestors at GAO.

[10] The doctrine of ripeness "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). A two-part test determines whether a claim is ripe for judicial action: (1) "whether the issues are fit for judicial decision—that is, whether there is a present case or controversy between the parties" and (2) "whether there is sufficient risk of suffering immediate hardship to warrant prompt adjudication—that is, whether withholding judicial decision would work undue hardship on the parties." *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1580–81 (Fed. Cir. 1993). The first part of the test requires that the "agency action is final." *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1362 (Fed. Cir. 2008).

that the plaintiff had not "pled any facts to suggest that [the agency was] not properly performing the technical re-evaluation"); *Textron, Inc. v. United States*, 74 Fed. Cl. 277, 288–89 (2006); *ManTech Telecomms. & Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 65 n.13 (2001), *aff'd*, 30 F. App'x 995 (Fed. Cir. 2002) (per curiam).[11]

> **B.**  **Plaintiff Has Standing to Assert Claims Relating to CLINs 17, 23, 28, 29, 30, 32, and 33**

To establish standing, plaintiff must show that it is an "actual or prospective bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract or by failure to award the contract."[12] *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (alterations in original) (quoting *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)).  A showing of "direct economic interest" requires the plaintiff to demonstrate that "any alleged errors caused prejudice."  *Global Computer Enters., Inc. v. United States*, 88 Fed. Cl. 350, 401 (2009).  "In post-award bid protests, the court 'looks twice at prejudice, first weighing prejudice as it pertains to standing, and then more thoroughly weighing prejudice to determine whether plaintiff shall be afforded relief.'"  *Magnum Opus Techs., Inc.*, 94 Fed. Cl. at 530 (quoting *A & D Fire Prot. Inc. v. United States*, 72 Fed. Cl. 126, 131 n.4 (2006)).  "[I]n a post-award bid protest, before reaching the merits of the parties' dispute, the court conducts only a 'limited review' of the plaintiff's allegations and the administrative record for the 'minimum requisite evidence necessary for plaintiff to demonstrate prejudice and therefore standing.'"  *Id.* at 530 n.12 (quoting *Night Vision Corp. v. United States*, 68 Fed. Cl. 368, 392 & n.23 (2005)).  "This threshold determination of standing should 'require [ ] only that a protestor be (1) either a bidder or proposer that has been prevented from bidding or proposing due to some infraction other than the terms of the solicitation itself; or (2) either a bidder or proposer who would be in contention absent the unreasonable procurement decision or violation of applicable procurement regulations.'"  *Id.* (alteration in original) (quoting *Textron, Inc.*, 74 Fed. Cl. at 285).  "The second, more searching prejudice inquiry relating to the merits requires assessing whether the plaintiff has established a 'substantial chance' it would have received the contract after 'review of the contract award or bid evaluation process to determine what might have occurred if the government had not erred.'"  *Id.* at 530 (citations omitted) (quoting *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006); *Weeks Marine, Inc. v. United States*, 79 Fed. Cl. 22, 35 (2007), *aff'd in relevant part*, 575 F.3d 1352 (Fed. Cir. 2009)).

---

[11] Defendant essentially argues that plaintiff should have waited until the corrective action was completed and then filed a new bid protest or supplemental pleadings.  Although the Court finds that plaintiff need not have done so, the Court notes that a court may sometimes look to supplemental pleadings to determine whether jurisdiction exists.  *See Ford Motor Co. v. United States*, No. 2011-1134, 2012 WL 3241005, at \*5 (Fed. Cir. Aug. 10, 2012) ("Consistent with *Rockwell International* [*v. United States*, 549 U.S. 457 (2007)], this court has not hesitated to consider post-complaint developments when the case warrants.").

[12] "The standing issue in this case is framed by 28 U.S.C. § 1491(b)(1), which [the Federal Circuit] ha[s] found imposes more stringent standing requirements than Article III."  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009).

Here, defendant and defendant-intervenor Siller argue that plaintiff lacks standing to assert claims relating to CLINs 17, 23, 28, 29, 30, 32, and 33.  They primarily rely on plaintiff's failure to meaningfully compare its proposal to the other proposals also not selected for the contested CLINs.  *See* Def.'s Mots. & Opp'n 26–28; Def.-Intervenor Siller's Opp'n to Croman's Mot. for J. on Administrative R. & Cross-Mot. for J. on Administrative R. ("Def.-Intervenor Siller's Mot. & Opp'n") 9–10, 18 (docket entry 41, June 6, 2012); *see also* Def.'s Reply & Mot. 7–10; Def.-Intervenor Siller's Reply in Opp'n to Croman's Mot. for J. on Administrative R. & in Supp. of Its Cross-Mot. for J. on Administrative R. ("Def.-Intervenor Siller's Reply") 2–4 (docket entry 58, July 3, 2012).

Based on the Court's review of plaintiff's allegations and the administrative record, the Court is persuaded that plaintiff has made a sufficient showing of prejudice to have standing to assert all of its claims relating to CLINs 17, 23, 28, 29, 30, 32, and 33.  Plaintiff would have been in contention absent the alleged unreasonable procurement decisions and violations of applicable procurement regulations.  The Court is persuaded by the fact that plaintiff proposed relatively low total prices for its helicopters; plaintiff's proposal received exceptional ratings for the safety/risk, past performance, and organizational experience factors; plaintiff's helicopters met the minimum payload requirement for all the contested CLINs; and plaintiff has alleged numerous errors in the evaluations and best-value tradeoff determinations.[13]  *See* Pl.'s Mot. 6, 13 & n.19, 14 & n.20, 18, 33–36; Pl.'s Resp. 9.  Accordingly, the Court **DENIES** defendant's motion to dismiss plaintiff's protest for lack of standing.[14]  *See, e.g.*, *GTA Containers, Inc. v. United States*, 103 Fed. Cl. 194, 201 (2012).

C.     *Defendant's Motion to Dismiss Plaintiff's Challenge to the Recent Solicitation for Four Helicopters, RFP 12-9025, for Lack of Standing Is Moot Because Plaintiff's Counsel Stated at Oral Argument that Plaintiff Does Not Challenge RFP 12-9025*

In its supplemental brief, plaintiff points to RFP 12-9025 as evidence that the cancellation of the four CLINs in RFP 11-9001—the solicitation at issue—was improper.  *See* Pl.'s Supplemental Br. 2.  Plaintiff seeks in that brief to enjoin RFP 12-9025.  *Id.* at 5.  However, plaintiff has not protested RFP 12-9025, a point plaintiff's counsel made clear at oral argument.  *See* Hr'g Tr. at 13:21–22, *Croman Corp. v. United States*, No. 12-75C (Fed. Cl. July 16, 2012) (hereinafter "July 16, 2012 Hr'g Tr.") ("[W]e're not challenging the later solicitation at all.") (docket entry 68, Aug. 10, 2012).  Accordingly, the Court **DENIES** on grounds of mootness defendant's motion to dismiss for lack of standing with respect to RFP 12-9025.  *See* Def.'s Mots. & Opp'n 28.

---

[13] The Court rejects defendant's argument that plaintiff failed to sufficiently address standing in its opening brief and thus waived the issue.  *See* Def.'s Mots. & Opp'n 26.

[14] However, as discussed *infra* in examining the merits, for some of plaintiff's allegations, the Court finds that plaintiff has not established it had a substantial chance to secure a contract absent the alleged errors.  *See USFalcon, Inc. v. United States*, 92 Fed. Cl. 436, 450 (2010) ("[E]ven though the question of prejudice involves the same test and a factual analysis in both contexts, the answers might differ due to the procedural posture."); *see also Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 697–99 (2010).

D.       *The Court Rejects Defendant's Argument that Plaintiff Waived or Abandoned Its Claims*

In *Blue & Gold Fleet, L.P. v. United States*, the Federal Circuit recognized "a waiver rule against parties challenging the terms of a government solicitation." 492 F.3d 1308, 1314 (Fed. Cir. 2007). Here, defendant argues that plaintiff has waived its claims regarding CLINs 17, 23, 28, 29, 30, 32, and 33 because the solicitation disclosed that performance requirements were a minimum and that technical factors, when combined, were significantly more important than price. Def.'s Mots. & Opp'n 29–32; Def.'s Reply & Mot. 10–12.

The Court rejects this argument because, as will become apparent below, plaintiff's objections are not to the terms of the solicitation, but to the agency's evaluations and best-value tradeoff determinations. *See* Pl.'s Resp. 9–12.

Defendant also argues that plaintiff has abandoned its challenge to the cancellation of CLINs 21, 22, 27, and 34 because it did not sufficiently address this claim in plaintiff's supplemental brief in support of its motion for judgment on the administrative record. *See* Def.'s Mots. & Opp'n 32–34; Def.'s Reply & Mot. 13–15. The Court rejects this argument because, as is evident in plaintiff's supplemental brief in support of its motion for judgment on the administrative record, plaintiff continues to challenge the Forest Service's decision to cancel four CLINs. *See* Pl.'s Supplemental Br. 2–3.

E.       *Standard for Review of Bid Protests*

In a bid protest action, the court will set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see* 28 U.S.C. § 1491(b)(4); *Banknote Corp. of Am. Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). The protestor will succeed when "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Banknote Corp. of Am.*, 365 F.3d at 1351 (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)) (internal quotation marks omitted). The protestor must show that the agency failed to provide a "coherent and reasonable explanation of its exercise of discretion" or that there was a "clear and prejudicial violation of applicable statutes or regulations." *Id.* (quoting *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1332–33) (internal quotation marks omitted).

The protestor's burden becomes more difficult as the degree of discretion vested in the contracting officer becomes greater. *DynCorp Int'l LLC v. United States*, 76 Fed. Cl. 528, 537 (2007). Negotiated procurements afford the contracting officer a "breadth of discretion"; "best value" awards afford the contracting officer additional discretion. *Id.* Therefore, in a negotiated, best-value procurement, the "protestor's burden is especially heavy." *Id.*

The disappointed offeror bears the burden to demonstrate an error sufficient to warrant relief. *Maint. Eng'rs v. United States*, 50 Fed. Cl. 399, 413 (2001). Establishing prejudice at the merits stage requires proving "that there was a substantial chance [the protestor] would have received the contract award but for this error." *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582

(Fed. Cir. 1996)) (internal quotation marks omitted).  *De minimis* errors in the procurement process do not justify relief.  *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996).  But "multiple errors might cumulatively establish prejudice."  *USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 450 (2010).  "Prejudice is a question of fact."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353 (Fed. Cir. 2005) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000)).  "In a multiple-award contract, prejudice analysis must take into account the impact of the error on all the awards, including whether the correction of an error 'might not only improve the protester's evaluation, but diminish that of a current awardee, or even eliminate that awardee from further consideration altogether.'"  *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 367 (2009) (quoting *Serco Inc. v. United States*, 81 Fed. Cl. 463, 501 (2008)).

In reviewing cross-motions for judgment on the administrative record, the court must determine "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  *A & D Fire Prot.*, 72 Fed. Cl. at 131.  In a manner "akin to an expedited trial on 'the paper record,'" the court will make findings of fact where necessary.  *CHE Consulting, Inc. v. United States*, 78 Fed. Cl. 380, 387 (2007) (quoting *A & D Fire Prot.*, 72 Fed. Cl. at 131).

F.      *Plaintiff's Claims Regarding the Agency's Evaluation of Proposals Are Unavailing*

"Evaluations may be conducted using any rating method or combination of methods, including color or adjectival ratings, numerical weights, and ordinal rankings."  FAR 15.305(a).  "The rating method need not be disclosed in the solicitation."  FAR 15.304(d).  Regardless of the method used to evaluate proposals, evaluations must document the "relative strengths, deficiencies, significant weaknesses, and risks" of the evaluated proposals.  FAR 15.305(a).  When tradeoffs are performed, FAR requires that the source selection record include "[a]n assessment of each offeror's ability to accomplish the technical requirements" and "[a] summary, matrix, or quantitative ranking, along with appropriate supporting narrative, of each technical proposal using the evaluation factors."  FAR 15.305(a)(3).

1.      Plaintiff Has Not Demonstrated that the Rating Methods for the Safety/Risk, Past Performance, and Organizational Experience Factors Were Irrational or Contrary to Law

At bottom, plaintiff challenges the averaging of whole numbers to arrive at numerical ratings carried out to multiple decimals because plaintiff claims this process led to numerical ratings that were "falsely precise."  Pl.'s Mot. 26–33; Pl.'s Resp. 32–40.  The Court finds that, although the agency's rating method may lead to false precision in some cases, *see, e.g.*, *Serco*, 81 Fed. Cl. at 488, plaintiff has failed to demonstrate that the rating method the agency used caused false precision *in this case*.  Plaintiff has not shown that its proposal deserved a better numerical rating for any of these three factors.  Plaintiff also has not shown that the other proposals deserved different numerical ratings from what they received.  In short, plaintiff has failed to demonstrate that the numerical ratings for these three factors did not accurately reflect the actual differences in the proposals.  *See Dismas Charities, Inc. v. United States*, 61 Fed. Cl. 191, 205 (2004) ("While the methodology used by [the agency] may be, at first glance, a bit

confusing to some, it is not irrational.  [The plaintiff] has not met its burden of showing that the evaluation of the proposals did not accurately reflect the actual differences in the proposals." (internal quotation marks omitted)).

Plaintiff's allegation that the adjectival ratings were undefined is simply incorrect, *see* Pl.'s Mot. 26–27, a fact that plaintiff appears to acknowledge in its response brief.  *See* Pl.'s Resp. 20, 22, 32 nn.28–29.  The SSP defined the adjectival ratings.  *See* AR Tab 3, at 24–25. Additionally, plaintiff notes in passing that the TET Reevaluation narrative uses the term "Above Acceptable," but does not define this term.  *See* Pl.'s Resp. 21 n.13.  However, even plaintiff concedes that all of the ratings were not required to be defined.  *See* Pl.'s Mot. 28 n.40.

Lastly, the Court rejects plaintiff's arguments in its response brief that amount to attempts to turn an arguable lack of clarity in the administrative record as to how the factors were rated into claims that the rating method was improper.  *See* Pl.'s Resp. 38–40.  For example, parts of the administrative record describing what occurred in the evaluations and reevaluations suggest that *the OM* assigned the numerical ratings for the safety/risk, past performance, and organizational experience factors, despite the fact that it is clear from elsewhere in the administrative record that the OM only assigned the numerical ratings for the overall technical rating and aircraft performance factor based on formulae the agency created.  The administrative record shows that *the TET* assigned the adjectival *and* numerical ratings for safety/risk, past performance, and organizational expert factors, and these numerical ratings were then entered into the OM.  The Court rejects plaintiff's argument that it was improper for the TET to assign *numerical* ratings in addition to assigning adjectival ratings.

> 2.   Plaintiff's Claims Regarding the Rating Method for the Aircraft Performance Factor Are Unavailing

Plaintiff argues that the numerical ratings carried out to multiple decimals for the aircraft performance factor created a false sense of precision.  Pl.'s Resp. 32–40.  However, plaintiff has not demonstrated that there was any false precision *in this case*.

For the first time in its response brief,[15] plaintiff notes that the aircraft performance factor was not assigned an adjectival rating by the TET.  Pl.'s Resp. 34.  The OM only assigned a numerical rating for each aircraft proposed for each CLIN based on the number of pounds by which the aircraft exceeded the minimum payload requirement and based on the capabilities of the other helicopters proposed for the CLIN.  Plaintiff argues that it was inconsistent with the SSP not to assign an adjectival rating.  However, plaintiff has not demonstrated that it was prejudiced by the failure of the agency to do so.  *See CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed. Cir. 1988) ("[The plaintiff] chooses not to dispute the [trial] court's clear finding on lack of prejudice: '[The plaintiff] . . . failed to demonstrate that it was prejudiced by any of the differences in relative importance between the RFP evaluation factors and the SSP

---

[15] Because the Court rejects plaintiff's arguments on the merits, the Court need not decide whether plaintiff waived its claims regarding the evaluation of the aircraft performance factor that were not raised until plaintiff's response brief, as argued by defendant.  *See* Def.'s Reply & Mot. 23.

[Source Selection Plan] evaluation factors.'  That finding is supported by record evidence . . . ." (fourth and fifth alterations in original) (quoting *CACI Field Servs., Inc. v. United States*, 13 Cl. Ct. 718, 729 (1987)); *see also USfalcon*, 92 Fed. Cl. at 453 (discussing relationship between SSP and evaluation method ultimately employed).

For the first time in its response brief, plaintiff also argues that the rating method for evaluating the aircraft performance factor was improper because keys on charts containing the proposals' ratings indicated that numerical ratings of 3.1 to 5 for the aircraft performance factor corresponded to adjectival ratings of marginal or unacceptable.  *See* Pl.'s Resp. 33–34 (citing AR Tab 3, at 24; AR Tab 67, at 15995–97, 16011, 16013, 16016, 16041, 16051).  However, defendant explains:

> [T]he Forest Service simply spread the Aircraft Performance numerical ratings over a 5-point scale instead of concentrating them within a 2-point scale, which would have eliminated the application of "Marginal" and "Unacceptable" descriptors to helicopters that met performance requirements.  If the Forest Service had scored Aircraft Performance on scale of 1-2.9, then it still would have to differentiate between the helicopters' performance capabilities in order to qualitatively evaluate the Aircraft Performance factor, which the 2011 RFP required.  AR 280.  For example, a helicopter that received the worst Aircraft Performance rating on a 1-5 scale (5.0) still would receive the worst Aircraft Performance rating on a 1-2.9 scale (2.9); only the number would change, not the helicopter's rating *relative to the competition*.

> . . . .  Here, the use of a more condensed scale for the Aircraft Performance factor would not have improved Croman's placement in that scale.  Croman does not argue that it would have, nor does it specify any way in which Croman, specifically, was harmed by use of an improper scale.

Def.'s Reply & Mot. 26.  The Court agrees with defendant's assessment of the effect of this alleged error.  *See also Seaborn Health Care, Inc. v. United States*, 101 Fed. Cl. 42, 52 (2011) (holding "that [the plaintiff] did not suffer any prejudice from the information provided in the solicitation or from the weights actually used in the evaluation of proposals").

### 3. Plaintiff Has Not Demonstrated that It Was Prejudiced by the Agency's Alleged Failure to Sufficiently Document Strengths and Weaknesses or that the Administrative Record Is Inadequate for Effective Judicial Review

Plaintiff has repeatedly argued that the administrative record is lacking in sufficient documentation of strengths and weaknesses.  *See, e.g.*, Pl.'s Mot. 22, 24 n.16, 26; Pl.'s Resp. 15 n.7, 16 n.9, 18–22, 24 n.16, 40 n.38.  The administrative record shows plaintiff's total prices, prices per pound, and adjectival and numerical ratings for technical factors and subfactors, as well as the TET Reevaluation narrative.  Plaintiff has not shown that it was prejudiced, even if the agency fell short of what is required by FAR, or that the record is inadequate for effective judicial review.

4.      The Agency Need Not Have Eliminated Defendant-Intervenor Siller's
        Proposal from Consideration for CLIN 23 Based on Price

The RFP stated that price proposals would be evaluated "to determine reasonableness and to determine the demonstrated understanding of the level of effort needed to successfully perform the services."  AR Tab 7, at 280.  Price proposals were also to be evaluated using the "Best Value" formula, which calculated the price per pound.  *Id.*; *see also* FAR 15.404-1(a)(1) ("The contracting officer is responsible for evaluating the reasonableness of the offered prices."); FAR 15.404-1(b)(2) ("The Government may use various price analysis techniques and procedures to ensure a fair and reasonable price.  Examples of such techniques include, but are not limited to, the following: . . . Comparison of proposed prices received in response to the solicitation.  Normally, adequate price competition establishes a fair and reasonable price."); AR Tab 3, at 12 ("It is anticipated that adequate competition will result in reasonable prices.  Past acquisitions and market research indicated there are more than enough potential Offerors to allow for adequate competition.").

In the Revised Request for Source Selection Authority, the CO stated, "Overall price reasonableness was determined based on comparison of two pricing factors[:] 1) prices proposed for the base year and three one year option periods, and 2) evaluating the average cost per pound for each aircraft as per the solicitation for the base year and three one year option periods."  AR Tab 67, at 15999; *see also id.* ("The TET and the Contracting Officer reviewed all of the pricing to determine price reasonableness . . . .").

In response to CLIN 23, the agency received fewer proposals than it did for the other CLINs requiring helicopters with medium-lift capabilities.  *See* AR 67, at 16054.  According to defendant, that CLIN 23 required a helicopter with at least medium-lift capabilities that was *equipped with a tank*, as opposed to a bucket, resulted in "a unique assortment of bids and . . . a higher average price."  Def.'s Mots. & Opp'n 50.   For this CLIN, plaintiff's total price for an aircraft was approximately [***] and defendant-intervenor Siller's total price for an aircraft was approximately [***].

Plaintiff concedes that "the Forest Service undertook . . . a review [of price] and, as a result, rejected offers on certain line items."  Pl.'s Mot. 15–16.  However, according to plaintiff, the agency "improperly failed to do so with regard to Siller's proposal on line item 23."  *Id.* at 16; *see* Pl.'s Resp. 24–32.  Plaintiff argues that the agency should have eliminated defendant-intervenor Siller's helicopters proposed for CLIN 23 because defendant-intervenor Siller's prices were unreasonable.  In support of its argument, plaintiff compares defendant-intervenor Siller's total price and daily availability rates to plaintiff's total price and daily availability rates and total prices and daily availability rates for awardee helicopters with *medium-lift capabilities*.  *See* Pl.'s Mot. 14–15, attach. 1.  Plaintiff also argues that the agency's failure to eliminate defendant-intervenor Siller's proposal was inconsistent with its decision to eliminate helicopters proposed by Erickson because the money saved, calculated in dollars and percentages, would have been greater in this instance.  Pl.'s Mot. 16.

In addition to arguing that defendant-intervenor Siller's price was unreasonable, plaintiff argues that the price showed a lack of understanding of the level of effort needed to perform the services required by CLIN 23.  According to plaintiff, defendant-intervenor Siller failed to

appreciate that CLIN 23 only required a helicopter with medium-lift capabilities to "meet" the performance requirements. Pl.'s Mot. 17.

Plaintiff's argument that the agency was required to eliminate defendant-intervenor Siller's proposal in response to CLIN 23 suffers from four principal flaws. First, defendant-intervenor Siller's total price was for a helicopter with heavy-lift capabilities. Thus, the agency received a helicopter with a payload that was much greater than the payload of helicopters with medium-lift capabilities. The payload requirements in the solicitation were only *minimums*. Second, as noted by defendant, the average proposed total price on CLIN 23 was approximately [***]. *See* Def.'s Mots. & Opp'n 49 (citing AR Tab 67, at 16054). Although defendant-intervenor Siller's total price was approximately [***] higher than plaintiff's total price, defendant-intervenor Siller's total price was only approximately [***] higher than the average proposed total price on CLIN 23. Third, plaintiff's argument fails to appreciate that defendant-intervenor Siller's price per pound was actually lower than plaintiff's price per pound. *Id.* at 50. Fourth, plaintiff's analogy to the agency's elimination of [***] helicopters is inapposite. When the agency eliminated [***] proposed helicopters, it did so because *similar performing helicopters* were available at a lesser cost to the agency. Plaintiff has not shown that any of its helicopters were similar to the helicopter proposed by defendant-intervenor Siller.

Accordingly, the Court finds plaintiff's claim that the agency was required to eliminate defendant-intervenor Siller's proposal responding to CLIN 23 from consideration to be unavailing.

G.     *Plaintiff Has Not Demonstrated that It Was Prejudiced by Alleged Errors in the Agency's Best-Value Tradeoff Determinations*

The best-value process is described in FAR 15.101-1: "This process permits tradeoffs among cost or price and non-cost factors and allows the Government to accept other than the lowest priced proposal. The . . . rationale for tradeoffs must be documented in the file in accordance with 15.406." FAR 15.101(c). FAR 15.308 addresses the role of the SSA. First, the SSA's "decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation." FAR 15.308. Second, the "decision shall represent the SSA's independent judgment." *Id.* Third, the decision "shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs," although any tradeoffs need not be quantified. *Id.*

The court in *Serco* thoroughly explained the requirements of the regulations, creating "a skeletal framework" of the inquiry. "First, the regulation requires the agency to make a business judgment as to whether the higher price of an offer is worth the technical benefits its acceptance will afford." 81 Fed. Cl. at 496. An agency must "do more than simply parrot back the strengths and weaknesses of the competing proposals—rather, the agency must dig deeper and determine whether the relative strengths and weaknesses of the competing proposals are such that it is worth paying a higher price." *Id.* at 497. Second, "the agency need neither assign an exact dollar value to the worth associated with the technical benefits of a contract nor otherwise quantify the non-cost factors. But . . . logic suggests that as that magnitude [of the price differential] increases, the relative benefits yielded by the higher-priced offer must also

increase." *Id.* (citation omitted).  Third, the agency must document its tradeoff analysis.  *Id.* "Conclusory statements, devoid of any substantive content, have been held to fall short of this requirement, threatening to turn the tradeoff process into an empty exercise."  *Id.*

Here, plaintiff challenges the use of the OM by the agency and the sufficiency of statements and explanations by the TET, CO, and SSA.  The OM assigned "overall technical ratings" based on the numerical ratings for the aircraft performance, safety/risk, past performance, and organizational experience factors.  The OM assigned the overall technical ratings with weights set by the TET to reflect the level of importance of the technical factors. The overall technical ratings were numerical ratings carried out to four decimals.  The OM was programmed by the TET to emphasize or prioritize the overall technical rating at [***] percent, total price at [***] percent, and price per pound at [***] percent.  The administrative record includes explanations of how the OM worked, *see* AR Tab 67, at 16040, 16210, and statements by the TET, CO, and SSA that the proposals selected by the OM represented the best value to the agency.  *See* AR Tab 67, at 16034–35; AR Tab 68, at 16213.

Even if the agency's use of the OM and the statements and explanations by the TET, CO, and SSA fell short of what is required by FAR 15.308, plaintiff has failed to establish that it was prejudiced by the agency's best-value tradeoff determinations.  "Prejudice in the context of a violation of FAR 15.308 requires that the protestor's chances of receiving the contract be increased" if the agency had complied with FAR.  *Info. Scis. Corp. v. United States*, 73 Fed. Cl. 70, 121 (2006).  The Court has four reasons for concluding that plaintiff has not shown prejudice.  First, as to CLIN 23, plaintiff has not demonstrated that any of the proposals should have been eliminated from consideration based on price.  Thus, plaintiff is required to show increased chances of receiving CLIN 23 even if no proposals were eliminated from consideration, which it has not done.  Second, regarding all of the disputed CLINs, plaintiff has failed to meaningfully compare its proposal with *any of the other proposals not selected*. Plaintiff's failure to do so is especially evident with respect to CLINs 17, 28, 29, 30, 32, and 33. *See Brooks Range Contract Servs., Inc. v. United States*, 101 Fed. Cl. 699, 713 (2011) (finding that the plaintiff had failed to establish prejudice to show standing in light of another proposal not selected).  Third, plaintiff has not established that the underlying evaluations were improper, which in turn could have affected the best-value tradeoff determinations.  *See id.*  Fourth, plaintiff has failed to demonstrate that this is a case in which plaintiff need not meaningfully compare its proposal to other proposals not selected, as plaintiff's counsel seemed to suggest at oral argument.  *See generally* July 16, 2012 Hr'g Tr. at 28:22–31:9, 76:11–21.

Accordingly, even if the agency failed to comply with FAR 15.308, plaintiff has failed to show that it was prejudiced.

H.     *Plaintiff Has Not Shown that the Cancellation of Four CLINs Was Irrational or the Agency's Reasons Were Pretextual*

"[A]n agency's cancellation decision must be supported by a 'rational' or 'reasonable' basis."  *Madison Servs., Inc.*, 90 Fed. Cl. at 680.  Here, four CLINs were cancelled due to, among other reasons, budget constraints.  *See* AR Tab 29, at 13408; *see also* AR Tab 67, at 15994.  Thus, the agency had a rational basis for its action, notwithstanding plaintiff's arguments that simply amount to a mere disagreement with the wisdom of the agency's decision.  *See* Pl.'s

Mot. 4 n.5, 18; Pl.'s Supplemental Br. 2–6.  To the extent plaintiff contends that the reasons for the cancellation were pretextual, *see* Compl. ¶¶ 82–97, plaintiff has not met its burden of providing clear and convincing evidence to demonstrate such.  *Def. Tech., Inc. v. United States*, 99 Fed. Cl. 103, 126 (2011).

> I.      *Defendant's Motion to Strike Is* **DENIED**

Defendant moves to strike attachment 1 to plaintiff's response brief and related portions of plaintiff's response brief.  *See* Def.'s Reply & Mot. 35–37.  Specifically, defendant moves to strike a letter from the Forest Service informing plaintiff that it was unsuccessful in its proposal responding to RFP 12-9025 and portions of plaintiff's response brief relating to the letter.  The Court indicated at oral argument that it would deny defendant's motion to strike.  *See* July 16, 2012 Hr'g Tr. at 6:7–9.

For substantially the reasons set forth in the Court's order denying plaintiff's motion to supplement the administrative record, *see* June 8, 2012 Order (docket entry 48), the Court **DENIES** defendant's motion to strike.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** plaintiff's motion for judgment on the administrative record; **DENIES** defendant's motion to dismiss on grounds of mootness and lack of standing; **DENIES** defendant's motion to strike; and **GRANTS** defendant's and defendant-intervenor Siller's cross-motions for judgment on the administrative record.  The Clerk shall enter judgment accordingly.

Some information contained herein may be considered protected information subject to the protective order entered in this action on March 2, 2012 (docket entry 18).  This Opinion and Order shall therefore be filed under seal. The parties shall review the Opinion and Order to determine whether, in their view, any information should be redacted in accordance with the terms of the protective order prior to publication. The Court **ORDERS** that the parties shall file, by **Monday, August 27, 2012**, a joint status report identifying the information, if any, they contend should be redacted, together with an explanation of the basis for each proposed redaction.

**IT IS SO ORDERED.**

 s/ George W. Miller
GEORGE W. MILLER
Judge